**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

GEORGE RAMISHVILI,                          )
                                            )
                    Plaintiff,              )   Civil Action No.: _1:21-cv-274 (GTS/TWD)_
                                            )
        v.                                  )
                                            )   **COMPLAINT**
TAMAR TORADZE,                              )
                                            )   **JURY TRIAL DEMANDED**
                    Defendant.              )
                                            )

**COMPLAINT**

Plaintiff George Ramishvili ("Plaintiff"), by and through undersigned counsel, brings this Complaint for defamation *per se* and, in the alternative, defamation and seeks injunctive and monetary relief against Defendant Tamar Toradze ("Defendant").   Plaintiff hereby states as follows in support:

**I.   NATURE OF ACTION**

1.     This civil action concerns Defendant's very serious and entirely fabricated accusations that Plaintiff was involved in the horrendous and high profile murder of her family in March 1992 in the country of Georgia.   Specifically, Defendant's accusations take two forms: first, Defendant falsely accuses Plaintiff of killing her two brothers in her neighbor's apartment in Tbilisi, the capital of Georgia; and, second, Defendant falsely accuses Plaintiff of threatening to hire someone for $100,000.00 to kill or harm her if she discloses that Plaintiff was involved in the murder of her family.

2.     Since March 1992 Defendant, who was 13 years old at the time of the horrific events, has often spoken about her family's murder, however she never mentioned Plaintiff in connection with such murder until Summer 2020.  In fact, in January 2015, Defendant published

a book, *The Vera Toradzes*, where she describes her family's tragic murder in detail. Following the publication of her book, Defendant participated in various interviews and discussed the events that led to the assassination of her family members as part of an armed operation led by the National Guard, the SWAT forces, and a military organization called the "Mkhedrioni,"[1] among other groups. Again, in Defendant's book and in subsequent interviews, Defendant **never** mentions Plaintiff as one of the four men who killed her two brothers.

3.     On June 4, 2020, Defendant began pursuing a campaign to damage Plaintiff's reputation during her interview on Alt-Info's Facebook page, a Georgian "far-right group," that has since been taken down by Facebook and labeled as spreading anti-Western and anti-LGBT narratives and disinformation. During the interview, for the first time in the last 28 years, Defendant falsely alleged that Plaintiff was one of the four men who killed her two brothers in her neighbor's apartment. Additionally, Defendant continued her smear campaign against Plaintiff by falsely alleging that Plaintiff's associates – through a specific phone call – threatened to hire someone for $100,000.00 to kill or harm her if she mentioned Plaintiff's name in connection with her family's murder.

4.     On June 11, 2020, Defendant was interviewed on GMTV's channel on YouTube regarding her family's 1992 murder, which has also since been taken down. Defendant was also interviewed about her family's murder on June 30 and July 5, 2020, by Obieqtivi TV as part of a

---

[1] A civil war erupted in Georgia on December 22, 1991, followed by the ousting of President Zviad Gamsakhurdia on January 6, 1992. Since that time, the Military Council of three leaders ruled Georgia: Tengiz Sigua (former prime minister), Tengiz Kitovani (former minister of defense), and Jaba Ioseliani (a leader of a military organization – Mkhedrioni). The Military Council invited Eduard Shevardnadze, a former foreign minister of USSR to Georgia. Mr. Shevardnadze returned to Georgia on March 7, 1992. Since then, the Military Council was abolished and a State Council was formed with the same leaders as above but chaired by Mr. Shevardnadze. State Council ruled the country until the parliamentary elections of October 11, 1992. Since 1995, Mkhedrioni has been outlawed; however, the group was reconstituted as the Union of Patriots political party.

docuseries, which was later available on its YouTube Channel.  In these interviews, Defendant reasserts her recently fabricated, false, and defamatory allegations regarding Plaintiff:  that he murdered her two brothers and that his associates recently threatened her to keep quiet regarding his alleged involvement in those murders.

5.    As part of her smear campaign against Plaintiff, on July 14, 2020, Defendant posted on her own Facebook page that Plaintiff is a "criminal" and "murderer," and encouraged that Plaintiff's "hands and legs" be cut off and that 2020 is his last year – suggesting that Plaintiff should be killed.

6.    Most recently, on December 26, 2020, Defendant elevated her relentless smear campaign against Plaintiff by placing an ad in the highly visible Georgia Commersant newspaper titled "Tamar Toradze's open letter to Kelly Degnan."  The ad – showcasing Defendant's open letter to the US Ambassador to Georgia – again reiterates Defendant's newly found false and defamatory allegations regarding Plaintiff and wrongly insinuates that Plaintiff was involved in numerous heinous crimes.  The fact that Defendant purchased an ad to expose a highly damaging letter she wrote to the US Ambassador is a clear indication of her carefully orchestrated efforts to destroy Plaintiff's and his business's reputation at any cost.

7.    Upon information and belief, the statements made by Defendant are part of her deliberate and calculated campaign predicated on generating media attention both in the United States and in Georgia to expose Plaintiff's name in a sensational and deeply dramatic fashion. Upon information and belief, Defendant is working in coordination with and at the direction of other Georgian accomplices.  Defendant is well aware that directly tying Plaintiff to a high profile and politically polarizing reinvestigation into her family's murder would cause severe damage to Plaintiff's well-earned business reputation both in Georgia and in the United States, as well as

globally.  Defendant also knows that spreading baseless murder accusations through major social media platforms and calling for revenge is not only reckless, but threatens physical harm to Plaintiff and his family, including other individuals mentioned in Defendant's accusations.

8.    In fact, Defendant's statements have already had serious, and nearly fatal, consequences on individuals mentioned in her salacious posts.  In a May 2020 Facebook post, Defendant implicated Giorgi Rurua, one of the shareholders of a Georgian TV Channel (Mtavari), and Leri Sulaberidze in her family's murder in 1992.[2]  Upon information and belief, the Georgian Chief Prosecutor's Office has since reopened its investigation into the murder of Defendant's family, including investigating whether Mr. Rurua was involved in the murder, likely as a result of – at least in part – Defendant's defamatory statements.[3]  A separate individual was also recently charged with attempted premeditated murder of Mr. Sulaberidze, which, upon information and belief, may have been motivated and encouraged by Defendant's accusation that Mr. Sulaberidze was one of the persons involved in her family's murder.

9.    Plaintiff's fear is only further reinforced by the publicly available evidence of Defendant's prior criminal conduct.  *See* Four Arrested During Alien Smuggling Attempt, *available at* https://www.justice.gov/usao-vt/pr/four-arrested-during-alien-smuggling-attempt (last visited March 8, 2021) ("The Criminal Complaint charged the driver, Tamar Toradze, 27, and

---

[2] Defendant made additional posts about Mr. Rurua and Mr. Sulaberidze on her Facebook account on July 29, 2020 and July 31, 2020.

[3] It is important to note that Plaintiff's Complaint solely seeks to address the defamatory statements that have been lodged against Plaintiff.  Plaintiff does not seek to comment on or take issue with any other pending investigations or allegations regarding any other individuals, including but not limited to Giorgi Rurua and Leri Sulaberidze.  Any other individuals referenced herein are named solely for the purpose of establishing the defamatory nature of Defendant's statements and the inconsistencies in her prior statements regarding the circumstances surrounding her family's murder and her specific allegations involving Plaintiff's alleged participation in her brother's murder.

her front seat passenger, Levan Arutinov, 25, with alien smuggling and conspiracy.  If convicted, they each face a maximum of ten years imprisonment and a $250,000 fine.").

10.     Plaintiff is a successful, well-known, and highly-respected businessman in Georgia whose business, Silk Road Group, enjoys close business and financial relationships with a number of international financial institutions and private investors.  The successful business operations of Silk Road Group rely heavily on foreign investment, the source of which includes wealthy individuals and financial institutions in the United States and Europe, and which are largely predicated on Plaintiff's and his company's good reputation and moral standing.

11.     Silk Road Group and its affiliates invested up to $1 billion in the Georgian economy:   the   company   employs   over   6,000   employees,   and   provides   essential telecommunications infrastructure services to millions of Georgian citizens and businesses in Georgia.

12.     Upon information and belief, Defendant is well aware of Silk Road Group's exceptional achievements and its significant role in the Georgian economy, and that Plaintiff is a founder and a majority shareholder of Silk Road Group.  Defendant is aware that causing maximum damage to Plaintiff's reputation causes an equal amount of damage to Silk Road Group's reputation and, consequently, millions of people in Georgia and the country of Georgia as a whole.

13.     Due to Defendant's defamatory actions, Plaintiff has suffered devastating consequences to his personal and business reputation in Georgia's business and political communities.  Consequently, the reputation of Plaintiff's business in Georgia and internationally will suffer further if Defendant is allowed to continue her relentless and deliberate assault on

Plaintiff's good reputation aimed to destroy his livelihood and Silk Road Group, which he founded over two decades ago.

14.     Based on what transpired with Mr. Rurua and Mr. Sulaberidze, Plaintiff is also in immediate danger of being the subject of the Georgian Chief Prosecutor's Office's reinvestigation and/or being the target of a potentially fatal attack.

15.     Plaintiff vehemently denies Defendant's outlandish, false and dangerous accusation that he had anything to do with the murder of her family.  Importantly, Plaintiff has never been a member of either the National Guard or Mkhedrioni or any other military organization that may have participated in the operation that led to the tragic death of Defendant's family.  Plaintiff was also gravely ill during the time when Defendant's family was murdered and thus could not possibly have been present.

16.     The complete falsity of Defendant's statements regarding Plaintiff is further evidenced by the various inconsistencies in her prior statements regarding the circumstances surrounding her family's murder and her specific allegations involving Plaintiff's alleged participation in her brother's murder.  Defendant's false and reckless statements are calls for revenge and the timing of these fabricated accusations is reflective of Defendant's apparent coordination with certain Georgian accomplices and raises serious questions about the true motives behind Defendant's actions.

17.     Defendant's false public statements made via various social media outlets has adversely affected both the reputation of Plaintiff and his company.  The reputational harm has been global, in the United States, where Plaintiff has significant business interests and in Georgia, where Plaintiff's highly successful business is based and where his good reputation in the Georgian society has been solidified for decades.  Such reputational harm has serious current and future

consequences with respect to securing essential investments from international financial institutions and global investor relationships. Plaintiff's companies currently have outstanding loans that could be rescinded if the institutions were to discover and believe these false allegations. Separately, these false allegations may become the subject of due diligence inquiries from international financial institutions. If the institutions were to discover and believe Defendant's defamatory statements, then Plaintiff and his companies will undoubtedly lose millions of dollars in loans. Additionally, the reputational harm of Defendant's defamatory statements may also cause serious damage to his global investor relationships, namely the US-Georgia investor relationships, which is an integral component of the company's continued growth. Accordingly, Defendant's false statements, which have already caused reputational and resulting financial harm to Plaintiff, continue to pose a continued financial risk to Plaintiff.

18.     Outside of financial harm to Plaintiff and his business, Defendant's statements have serious implications to his personal life: he may be subject to the Georgian Chief Prosecutor's Office's reinvestigation in to Defendant's family's murder, which would cause further unwarranted damage to Plaintiff's reputation, and – even more threatening – he may be the target of a premeditated murder like others who Defendant has accused of being involved in the murder of her family. Defendant's false statements have irreversible life-altering consequences.

19.     Accordingly, Plaintiff brings this action to vindicate his rights and his reputation under the law. Plaintiff seeks injunctive relief and money damages, in an amount exceeding $75,000.00, for the severe harm caused by Defendant's false, defamatory, and sensational statements.

## II.    PARTIES

20.    Plaintiff is an individual and is now, and at all relevant times mentioned in this Complaint, a resident of Tbilisi, Georgia.

21.    Upon information and belief, Defendant is an individual residing in Highland, New York.  Upon information and belief, Defendant has resided at this location since November 2017. Upon information and belief, Defendant has resided in the United States since October 2004.

## III.    JURISDICTION AND VENUE

22.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) because the parties are from different states and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs.

23.    The Court has personal jurisdiction over Defendant pursuant to N.Y. C.P.L.R. § 301 because Defendant is a resident of Ulster County, Highland, New York.

24.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in Ulster County, Highland, New York.  Alternatively, venue is appropriate under 28 U.S.C. § 1391(b)(2) and/or (b)(3) because a substantial part of Defendant's defamatory statements which give rise to this Complaint occurred in the State of New York.

## IV.  FACTUAL ALLEGATIONS

### Background on Plaintiff

25.    Plaintiff is the founder and Chairman of Silk Road Group, one of the leading private investment groups in the Caucasus and Central Asian regions.

26.    Plaintiff currently holds a stake of approximately 60 percent of Silk Road Group, which accounts for a large source of his wealth.

27.     Plaintiff founded Silk Road Group in 1997 as a transportation and logistics business.  Under the direction of Plaintiff, Silk Road Group has experienced steady growth and is now Georgia's third largest private enterprise.

28.     Early on, Silk Road Group entered into a number of transportation contracts with western multinationals for the transport of commodities, establishing itself as a leader in the area of rail transportation of liquid and dry cargoes.

29.     Under Plaintiff's direction, Silk Road Group evolved with the changing business environment in Georgia and expanded across various sectors of the Georgian economy, including: transportation, technology, trading, media & IT, energy, real estate, retail, hospitality and entertainment, telecommunications, and banking.

30.     Since its inception, Silk Road Group has partnered with numerous established and reputable international and U.S.-based organizations, including Elf Trading ("Elf"), Addax & Oryx Group, the Carlson Rezidor Hotel Group, ISAF (the NATO-led International Security Assistance Force in Afghanistan), General Electric, British Petroleum, Glencore, Vitol, U.S. Overseas Private Investment Corporation ("OPIC"), BNP Paribas, ABN AMRO, Bank of Georgia, Banque Cantonale de Genève, and National Geographic.

31.     Below is a brief description of Silk Road Group's U.S.-based interests:

a.     In 2010, OPIC, the U.S. government's development finance institution, financed a cold storage project in Poti, Georgia in the amount of $3.9 million, where Silk Road Group had a majority stake;

b.     Since 2012, Silk Road Group, through its affiliate NG Georgia, has a license agreement with National Geographic;

c.      To date, Silk Road Group has partnered with the principal contractors of the Coalition Forces and, as a result, U.S. forces in Afghanistan for the supply of essential equipment, including jet fuel and container cargo deliveries to the Allied Forces in Afghanistan;

d.      To date, 36.73 percent shares of Bakhvi Hydro Power LLC – a company in the energy wing of Silk Road Group – are beneficially owned by the U.S. company, Cerberus Capital Management; and

e.      In 2019, Silknet JSC, an affiliate of Silk Road Group, issued notes in the amount of $200,000,000.00 to the official list of the Irish Stock Exchange, now trading as Euronext Dublin.  The beneficiaries of these bonds include U.S.-based investors.

32.     The international success of Plaintiff and Silk Road Group, as evidenced by the high profile international partnerships outlined above, is also at the heart of Georgia's economic success.  Under the direction of Plaintiff, Silk Road Group has invested nearly $1 billion in the country since its founding and has been a leading player in its transition to a modern capitalist economy.  Accordingly, the successful business operations of Silk Road Group heavily rely on access to western capital, which is largely predicated on Plaintiff's and his company's good reputation and moral standing.

33.     The Defendant's false and defamatory statements have created significant reputational risk for the Plaintiff and, as a result, has caused and continues to threaten significant financial harm to the continued viability of Silk Road Group's business, including the aforementioned partnerships.

### The 1992 Toradze Family Murder and Defendant's Earlier Statements

34.     In the 1990s, two of Defendant's brothers were allegedly involved in various conflicts with the military organization in Georgia called the Mkhedrioni as well as some other

groups and people, including the National Guard and Special Forces.  According to public sources, in March 1992, after Defendant's brothers did not allegedly obey a direct order from the military in connection with the military's raid of the National Guard and the Mkhedrioni, her brothers open fired, killing one member.  The members of the military raid responded by firing on Defendant's family, killing her parents and one of her brothers.

35.     Also, according to public reporting, the National Guard and Mkhedrioni then inspected the Defendant's family apartment and neighboring apartments for firearms.  According to neighbors of Defendant's family, Defendant's family stored a significant amount of firearms in their apartment and even sandbags allegedly supporting evidence that Defendant's family was prepared for conflicts.  During an inspection of Defendant's neighbor's apartment, two of Defendant's brothers were allegedly killed in the presence of a 13-year old Defendant by four members of the raid.  Defendant has spoken openly about her family's murder through her own publication as well as numerous interviews.

36.     Starting on January 1, 2015, Defendant published a book, *The Vera Toradzes*, which described her family's 1992 murder from her own perspective.  *See generally* Exhibit 1 at 10-19.[4]  In relevant part, she described in detail being present for the murder of her two brothers in her neighbor's apartment.  She stated that four men entered her neighbor's apartment, but she saw only two and could only tell that one man had a beard and one man did not have a beard.  *Id.* at 15.  Defendant stated that two of the four men murdered her brothers.  *Id.*  Defendant wrote that she locked eyes with one of the murderers and described him as having "scared wide eyes, [a] triangle shaped skinny face . . . [and] [h]e was with [a] white shirt and a bulletproof vest . . . ."  *Id* at 16.  Upon information and belief, Defendant was residing in the United States when she

_____

[4] As a part of this exhibit, there is a certified translation.

published *The Vera Toradzes*.  Upon information and belief, Defendant's book was available for free online.

37.     On April 3, 2015, Defendant was interviewed by Ketevan Zarnadze of Info9.  *See* Exhibit 2 at 2.[5]  During the interview, Defendant only spoke generally about two of her brothers who were involved in the conflict with various groups and people.  *Id.*  Upon information and belief, Defendant was residing in the United States when she participated in this interview.  The interview is also available online at the following address: https://info9.ge/sazogadoeba/videoreportazhi/115331-vereli-torazeebis-tragedia-7-msxverpli-da-mravali-upasuxo-kitxva-.html?lang=ka-GE&year=2016&month=9. (last visited on March 8, 2021).

38.     On April 13, 2015, Defendant was interviewed by Temo Danelia on Saerto Gazeti regarding her book, *The Vera Toradzes*.  *See* Exhibit 3 at 4.[6]  During this interview, Defendant described her brothers' murders in her neighbor's apartment.  *Id*. at 4-6.  In doing so, for the first time, she identified Mr. Rurua as one of the men who killed her brothers.  *Id.* at 6.  Without identifying how many men there were, she only identified the other remaining men as "bearded and masked."  *Id.*  Although Defendant identified Mr. Rurua as one of the murderers in this interview, Defendant tellingly made **no** reference to Plaintiff as one of the individuals who killed her brothers.  Upon information and belief, Defendant was residing in the United States at this time.  This interview was widely broadcasted in Georgia.

---

[5] As a part of this exhibit, there is a certified translation.
[6] As a part of this exhibit, there is a certified translation.

**Defendant's False Statements Involving Plaintiff**

39.     On May 17, 2020, Defendant wrote a lengthy post on her personal Facebook page

directed to President Donald Trump, as well as other political figures in the United States, stating

that "Giorgi Rurua is not a media owner and a political prisoner, he is a cold blooded murderer."

*See* Exhibit 4 at 1.  In Defendant's May 2020 Facebook post, she described in detail her family's

murder.  *Id.* at 1-3.  In doing so, she also provided a description of the men who killed her family.

*Id.* at 2.  Specifically, Defendant described an encounter she had with four men in her neighbor's

apartment: one member she identified as "Giorgi Rurua" or "Zhorika"; and the other she identified

as "another tall man."  *Id.*  Defendant alleges that both of these men killed her two brothers in front

of her at her neighbor's apartment.  *Id.*  Defendant also states that "[a]t some point, Leri

Sulaberidze took my younger brother Paata to the bathroom, put a gun to his head and was going

to murder him as well if someone hadn't interfered and saved him."[7]  *Id.*

40.     Defendant does not mention Plaintiff in this Facebook post.  Defendant's Facebook

post has been republished, on at least three occasions, on a widely disseminated web-based news

source in Georgia.  *See, e.g.*, AGENDA.GE, *Georgia requests US help in high-profile murder case*

*involving opposition-minded TV channel co-founder Giorgi Rurua*, available at

agenda.ge/en/news/2020/1724 (last visited March 8, 2021); Georgia Today, *Tamar Toradze Urges*

*Senator Risch not to Call Giorgi Rurua* "*political prisoner,*" available at

http://georgiatoday.ge/news/21139/Tamar-Toradze-Urges-Senator-Risch-not-to-Call-Giorgi-

---

[7] Defendant continued to make statements regarding Mr. Rurua and Mr. Sulaberidze: on July 29, 2020, Defendant posted on her Facebook Page: "[D]on't hide behind the bushes waiting for Leri Sulaberidze anymore.  Or if you still do, hit him then  . . . .," *see* Exhibit 5; and on July 31, 2020, Defendant posted on her Facebook Page tagging Senator Jim Risch:  "Mr. Risch! How much does Rurua pay you??  Perhaps you would like to lend him your wife and children as well to f@ them? I personally will be your bitter enemy if you again get involved in the position of protecting the murderers!" *see* Exhibit 6.  As a part of these exhibits, there are certified translations.

Rurua-%22political-prisoner%22 (last visited March 8, 2021); and Caucasus Watch, *Georgia requests aid from USA in murder case involving Giorgi Rurua*, available at https://caucasuswatch.de/news/2763.html (last visited March 8, 2021). Upon information and belief, Defendant was residing in New York when she published this post.

41.     On June 4, 2020, Defendant was interviewed by a journalist associated with Alt-Info on its Facebook page. *See* Exhibit 7 at 10-19.[8] Alt-Info is a Georgian "far-right group" that "spreads anti-Western and anti-LGBT narratives and disinformation." *See* Medium, *Georgian far-right group expands Facebook presence ahead of elections*, available at https://medium.com/dfrlab/georgian-far-right-group-expands-facebook-presence-ahead-of-elections-542df928d3fb (last visited March 8, 2021). Based on media reports, Alt-Info attempted to present itself as a "credible mainstream online media outlet, conducting Facebook live interviews and sharing articles" to expand both its audience and its online presence. *Id.* Previously, in May 2019, Alt-Info's Facebook page was taken down along with other far-right pages; however, a new page was created in June 2019. *Id.* As of June 15, 2020, Alt-Info's Facebook page had 37,256 followers and its page "has been steadily building an audience over the last three months." *Id.*

42.     On October 23, 2020, "Facebook removed 130 assets linked to Alt-Info" because "Alt-Info was using an inauthentic network of Facebook accounts, groups, and page to disseminate its content." *See* Medium, *Facebook removes inauthentic assets connected to Georgian far-right group Alt-Info*, available here https://medium.com/dfrlab/facebook-removes-inauthentic-assets-connected-to-georgian-far-right-group-alt-info-f560f5c121a1 (last visited March 8, 2021). Specifically, Facebook issued the following public statement regarding its removal of Alt-Info's

---

[8] As a part of this exhibit, there is a certified translation.

Facebook page:  "This network used fake accounts to post and comment on their own content to make it appear more popular than it was, and manage Pages, some of which posed as independent from one another . . . Some of this activity included posting hate speech and information rated false by independent fact-checkers in Georgia."  *Id.*

43.    Below are the relevant excerpts from Defendant's prior interview with Alt-Info:

a.    For the first time, Defendant stated that Plaintiff, or "Zarala," was the "tall one" she previously described in her May 17, 2020 Facebook post who was with Mr. Rurua and murdered members of her family, along with two other masked men.  *See* Exhibit 7 at 10.  In particular, Defendant stated that Plaintiff was shooting at her brother, Imedo.  *Id.* at 11-12.

b.    Defendant further stated that she has received phone calls over the span of two days from Plaintiff's "people" who threatened her via Facebook to keep quiet or they will pay someone $100,000.00 to make her disappear in a second if she mentions him by name in connection with her family's murder.  *Id.* at 11-12.

c.    Defendant made other defamatory remarks regarding Plaintiff throughout the interview.  *See generally id.* at 10-19.

44.    Upon information and belief, Defendant was residing in New York when she participated in the Alt-Info interview and made these false and defamatory statements about Plaintiff.  As of June 22, 2020, this Facebook interview had 110,000 views; however, as stated above, this interview on Alt-Info's Facebook page has since been removed.

45.    On June 11, 2020, Defendant was interviewed on GMTV's channel on YouTube.  *See* Exhibit 8 at 9.[9]  During the interview, Defendant spoke about her family's murder in 1992.  *Id.* Defendant stated that when her two brothers were murdered in her neighbor's apartment, she

---

[9] As a part of this exhibit, there is a certified translation.

recalled that Mr. Rurua was wearing a white t-shirt and a bulletproof vest. *Id.* She also stated that the tall man next to Mr. Rurua was Plaintiff, who murdered her brother. *Id.* She stated that Plaintiff was not wearing anything to cover his face but failed to provide any further description. *Id.* Defendant also identified two other men who accompanied Mr. Rurua and Plaintiff that had on masks. *Id.*

46.     During this June 2020 interview, Defendant stated again that Plaintiff's associates threatened to pay an individual $100,000.00 to kill her if she identified him in connection with her family's murder. *Id.* at 13. She further stated that she received this threat via "an unidentified number." *Id.* Upon information and belief, Defendant was residing in New York when she participated in this interview and made these false and defamatory statements about Plaintiff. This interview had at least 464 views since June 11, 2020; however, upon information and belief, this interview on GMTV's Channel on YouTube has been taken down.

47.     On June 30, 2020, Defendant was interviewed by Obieqtivi TV Channel on YouTube. *See The Toradze family killing. 1992. Part 1*, available at https://www.youtube.com/watch?v=o1PsNi3NiF0 (last visited March 8, 2021). Obieqtivi is known for its "anti-western, Turkophobic and homophobic editorial policy." Media Profiles – Obieqtivi, MEDIA METER, http://mediameter.ge/en/media-profiles/obieqtivi (last visited March 8, 2021). In the interview, Defendant discussed events that led to her family's murder in 1992. *Id.* The Obieqtivi TV interview appears to be a multi-part series. Upon information and belief, Defendant was residing in New York when she participated in this interview and made these false and defamatory statements about Plaintiff. This interview has been viewed 3,325 times since it was posted.

48.     On July 5, 2020, Defendant was interviewed again by Obieqtivi.  *See Part 2*, available at https://www.youtube.com/watch?v=8AF4bkAOPNU (last visited March 8, 2021). During the interview, Defendant stated that Mr. Rurua and the "other tall guy" open fired at her brothers in her neighbor's apartment.  *Id.*  Upon information and belief, Defendant was residing in New York when she participated in this interview and made these false and defamatory statements about Plaintiff.  This interview has been viewed 1,649 times since it was posted.

49.     On July 14, 2020, Defendant posted on her Facebook page that Plaintiff is a "criminal" and "murderer," and encouraged that the public cut off his "hands and legs."  *See* Exhibit 9 at 1.[10]  She further stated that 2020 was Plaintiff's last year.  *Id.*  Upon information and belief, Defendant was residing in New York when she published this post.

50.     Most recently, on December 26, 2020, Defendant's open letter to the US Ambassador to Georgia was published in an article by Commersant.  *See* Exhibit 10, *Tamar Toradze's open letter to Kelly Degnan,* Commersant (Dec. 26, 2020), available at https://commersant.ge/en/post/tamar-toradzes-open-letter-to-kelly-degnan ("Open Letter to US Ambassador").  In this letter, Defendant asked the US Ambassador to Georgia to consider Plaintiff in connection with the murder of her family, falsely asserting that "Ramishvili and Sulaberidze are the creators of my family tragedy.  They, together with Rurua, murdered my parents and brothers." *Id.* at 1-2.  Defendant also insinuates that Plaintiff has been involved in dozens of murders and heinous crimes.  Defendant further asserts that she has named Plaintiff in her testimony to the FBI.

51.     Despite Defendant's false and outrageous allegations, Plaintiff was never a member of or affiliated with the Mkhedrioni or any other military organizations.  Therefore, he could not have been one of the four men who killed her brothers in her neighbor's apartment in Georgia.

---

[10] A certified translation is provided as part of this exhibit.

52.     Separately, at the time that Defendant's family was murdered, Plaintiff was ill and thus could not possibly have been present for the alleged murders that Defendant baselessly connected him to.

## V.   CLAIMS FOR RELIEF

### COUNT I
### (DEFAMATION *PER SE*)

53.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 52 above as if fully stated herein.

54.     On June 4, June 11, June 30, July 5, July 14, and December 26, 2020, Defendant knowingly made false and defamatory statements about Plaintiff to third parties that were reasonably understood by those who read or heard them to be statements of Plaintiff committing serious crimes.

55.     Upon information and belief, Defendant made two false statements on five separate occasions including, among other things, that:  (1) Plaintiff, or "Zarala," was the "tall one" that she previously described as being with Mr. Rurua, along with two other raid members, who murdered her two brothers in her neighbor's apartment in Georgia, *see* Exhibit 7,  Exhibit 8; *see also* June 30 and July 5, 2020 interview with Obieqtivi; *see also* Exhibit 10; and (2) Plaintiff's associates, via Facebook or an unidentified number, threatened to pay an individual $100,000.00 to kill or harm her if she identified him in connection with her family's murder, *see* Exhibit 7, Exhibit 8.   There are also other instances of Defendant calling Plaintiff a "criminal" and "murderer."   *See* Exhibit 9 (collectively referred to as "Defendant's Statements").

56.     Defendant's Statements are all false, misleading, and defamatory in that they state that Plaintiff was involved in a horrific murder.   Defendant's Statements also state that Plaintiff has threatened to kill or harm Defendant to prevent her from disclosing his name in connection

with her family's murder and that Plaintiff has been involved in dozens of other murders and heinous crimes.  These statements allege that Plaintiff has committed serious crimes.

57.     These statements are outright false.  It is telling that Defendant has utilized platforms that have been subject to scrutiny for their improper purposes.  For example, Facebook has taken down Alt-Info's Facebook Page for a second time for "using an inauthentic network of Facebook accounts, groups, and pages to disseminate its content."  *See supra* ¶ 42.  Additionally, Defendant's June 11, 2020 interview on GMTV's channel on YouTube has been taken down.  *See supra* at ¶ 46.  Defendant has clearly sought out platforms that would be more willing to publish false content than verified, trust-worthy media platforms.

58.     It is also impossible for Plaintiff to have committed the crimes in Defendant's accusations:  Plaintiff was never a member of or affiliated with the Mkhedrioni or any other military groups in Georgia.  Therefore, he could not have been one of the four men in Defendant's neighbor's apartment.   Separately, when Defendant's family was murdered in March 1992, Plaintiff was ill and thus could not have been present.

59.     Despite these plainly incorrect facts, there are also various inconsistencies in Defendant's version of events that further demonstrate the falsity of her statements:

a.     In Defendant's June 4, 2020 interview with Alt-Info, she stated that she was threatened by one of Plaintiff's associates via Facebook, *see* Exhibit 7; however, subsequently, in her June 11, 2020 interview on GMTV, she stated that Plaintiff's associates threatened her via an "unidentified" telephone number, *see* Exhibit 8.

b.     In Defendant's January 2015 book, she stated that she only saw two of the four men who entered her neighbor's apartment in 1992:  one had a beard and one did not.  *See* Exhibit 1.  In Defendant's April 13, 2015 interview by Saertogazeti.ge, she identified Mr. Rurua

and stated that the other men were bearded and masked.  *See* Exhibit 3 at 6.  In Defendant's May

17, 2020 Facebook post, she again identified Mr. Rurua and another "tall man," but did not provide

any further information regarding the two other men.  *See* Exhibit 4.  It was not until Defendant's

June 4, 2020 interview with Alt-Info that she began identifying Plaintiff as the "tall one."  For the

previous 28 years, Defendant had not once described or implied that Plaintiff, or even a "tall one,"

was one of the four men who were in her neighbor's apartment in March 1992.

60.     Without any authorization from Plaintiff, Defendant communicated these lies about

Plaintiff to the United States and Georgian public at-large starting on June 4, 2020.  As a part of

Defendant's smear campaign that, upon information and belief, she carried out in coordination

with Georgian accomplices, Defendant disseminated and published these false and defamatory

statements on, at a minimum, her personal Twitter Account, her personal and publicly accessible

Facebook account, Saertogazeti.ge, the Alt-Info Facebook page, the GMTV Channel on YouTube,

the Obieqtivi TV Channel on YouTube, and Commersant, as well as other websites that

republished such statements and interviews, in a manner that achieved widespread exposure to a

global internet audience, at least 115,219 views—not counting republications, thereby causing

substantial injury to Plaintiff one click at a time.

61.     Upon information and belief, Defendant and her Georgian accomplices coordinated

to make such defamatory statements about Plaintiff even though they knew they were false.

Defendant made these statements as part of her and her Georgian accomplices' agenda to discredit

Plaintiff and to damage his well-earned business reputation in Georgia and globally by linking him

to a high profile reinvestigation into her family's murder.

62.     Defendant's Statements are malicious and false statements that expose Plaintiff to

hatred, contempt, or aversion, or induce an unsavory opinion of him in the minds of the community

at-large in Georgia and in the United States.  These statements are *per se* in that they allege that Plaintiff committed serious crimes.

63.     Based on Defendant's Statements, Plaintiff has suffered and will continue to suffer non-economic damages, including personal humiliation, emotional distress, and damage to his reputation and standing in the community.  This has directly affected Silk Road Group's reputation, as well.  Such reputational harm has *serious* current and future consequences with respect to financing by international financial institutions and global investor relationships. Plaintiff's and his company's current outstanding loans may be rescinded if the institutions were to discover and to start believing in these false allegations.  Separately, Plaintiff and his company may lose millions in prospective loans if the institutions were to discover Defendant's Statements. Further, the reputational harm of Defendant's defamatory statements may also cause serious damage to his global investor relationships, namely the US-Georgia investor relationships, which are an integral component of the company's continued growth.   Accordingly, Defendant's Statements pose a serious financial risk to Plaintiff.

64.     Outside of reputational and financial harm to Plaintiff, Defendant's statements have serious implications to his personal life:  he may be subject to the Georgian Chief Prosecutor's Office reinvestigation in Defendant's family's murder which would cause further unwarranted damage to his reputation and, even more threatening, he may be the target of a premeditated murder.  Defendant's false statements have real, serious consequences to Plaintiff's life.

65.     As a direct and proximate cause of the false and defamatory statements, Plaintiff has suffered, and continues to suffer substantial damages, including, without limitation, the reasonable expectation of loss of millions in current and future loans, and, accordingly, Plaintiff is entitled to damages in an amount to be determined at trial, but not less than $75,000.00.

## COUNT II
## (IN THE ALTERNATIVE, DEFAMATION)

66.     Plaintiff repeats and realleges each and every allegation contained and set forth in paragraphs 1 through 65 herein.

67.     Through posting Defendant's Statements on, at a minimum, her personal Twitter Account, her personal and publicly accessible Facebook account, Saertogazeti.ge, the Alt-Info Facebook page, the GMTV Channel on YouTube, the Obieqtivi TV Channel on YouTube, and Commersant, as well as other websites that republished such statements and interviews, Defendant has falsely and repeatedly claimed that Plaintiff has engaged in various nefarious actions, including, but not limited to: (1) assisting in the murder of her family in Georgia; and (2) threatening to kill or harm her if she discloses Plaintiff's name in connection with her family's murder.   These published statements in Georgia and the United States have been heard by thousands of individuals and their continued dissemination cause significant injury to Plaintiff.

68.     Defendant's Statements have damaged Plaintiff's reputation among the community at-large in both Georgia and the United States, and caused them to associate him with one of the most horrific murders in Georgia's history and to silence Defendant from associating him with that murder.   This was exactly Defendant's intent:   she made these statements as part of her smear campaign to discredit Plaintiff and to damage his well-earned business reputation in Georgia and globally by linking him to a high profile reinvestigation into her family's murder.   Upon information and belief, Defendant is engaged in such campaign with other Georgian accomplices.

69.     Defendant knew and should have known that these statements were false, or at the very least, that Defendant made these statements with reckless disregard for their truthfulness.   As stated above, Defendant was fully aware of what she was doing when she made these defamatory statements regarding Plaintiff because it was a part of her smear campaign efforts.

70.     As a result of the false and defamatory statements published by Defendant, Plaintiff has been forced to make an expenditure of money to remedy the defamation.

71.     Plaintiff has suffered and will continue to suffer non-economic damages, including personal humiliation, emotional distress, and damage to his reputation and standing in the community.  This has directly affected Silk Road Group's reputation, as well.  Such reputational harm has *serious* current and future consequences with respect to financing by international financial institutions and global investor relationships.  Plaintiff's and his company's current outstanding loans may be rescinded if the institutions were to discover and to start believing in these false allegations.  Separately, Plaintiff and his company may lose millions in prospective loans if the institutions were to discover Defendant's Statements.  Further, the reputational harm of Defendant's defamatory statements may also cause serious damage to his global investor relationships, namely the US-Georgia investor relationships, which are an integral component of the company's continued growth.  Accordingly, Defendant's Statements pose a serious financial risk to Plaintiff.

72.     Outside of reputational and financial harm to Plaintiff, Defendant's statements have serious implications to his personal life:  he may be subject to the Georgian Chief Prosecutor's Office's reinvestigation into Defendant's family's murder which will cause further unwarranted damage to his reputation and, even more threatening, he may be the target of a premeditated murder.  Defendant's false statements have real, irreversible life-altering consequences to Plaintiff's life.

73.     Upon information and belief, Defendant's Statements have caused Plaintiff to suffer special damages in that his reputation has been injured in the communities where he lives and works and has been held up to ridicule and contempt by family, friends, coworkers,

acquaintances, neighbors, and the public in general to associate him with criminal behaviors.  As stated above, these statements may cause Plaintiff and his company to lose millions in current and future loans through international financial institutions in the event that these institutions were to discover and to start believing Defendant's false and defamatory allegations.

74.     As a direct and proximate cause of the false and defamatory statements, Plaintiff has suffered, and continues to suffer substantial damages, including, without limitation, the reasonable expectation of loss of current and/or future loans, and, accordingly, Plaintiff is entitled to damages in an amount to be determined at trial, but not less than $75,000.00.

## VI.   PRAYER FOR RELIEF

75.     **WHEREFORE**, Plaintiff respectfully requests that the Court enter an order and judgment in favor of him against Defendant, containing the following relief:

a.      Permanently enjoining Defendant, as well as any and all other persons, corporations, or other entities in active concert or participation with Defendant, from engaging in any further acts of defamation against Plaintiff.

b.      Awarding Plaintiff damages in an amount to be proven at trial, but no less than $75,000.00 to compensate Plaintiff for the harm to his professional reputation and all money losses that he has suffered.

c.      Awarding Plaintiff punitive and exemplary damages, in an amount to be proven at trial;

d.      Awarding Plaintiff interest in an amount according to law;

e.      Requiring Defendant to pay Plaintiff his costs and expenses in this action, including attorneys' fees and costs.

f.      Granting Plaintiff such other relief that the Court deems just or proper.

## VII.   DEMAND FOR JURY TRIAL

76.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury in this action on all claims so triable.

Dated:  March 9, 2021

Respectfully submitted,

/s/ Alexandra C. Manfredi
Alexandra C. Manfredi (N.Y. Bar No. 5218953)
Reed Smith LLP
599 Lexington Avenue, 22nd Floor
New York, NY 10022
Telephone:  212.521.5400
Facsimile:  212.521.5450
AManfredi@reedsmith.com

Rizwan A. Qureshi (DC Bar No. 1024603)
Reed Smith LLP
1301 K Street, N.W.
Suite 1000 - East Tower
Washington, DC  20005
Telephone:  202.414.9200
Facsimile:  202.414.9299
rqureshi@reedsmith.com
(*Pro Hac Vice Motion Forthcoming*)

*Counsel for Plaintiff*